**In re SENTRY PARK, LTD., Debtor.**

**Bankruptcy No. 88–60230.**

United States Bankruptcy Court,
W.D. Texas,
Waco Division.

June 16, 1988.

Alan J. Harlan, Randy Ford Taub, Harlan, Selander, Vernon & Quilling, P.C., Dallas, Tex., for Sentry Sav. Ass'n.

Karl R. Quebe, Sleeper, Johnston, Helm & Fontaine, P.C., Waco, Tex., for debtor.

## OPINION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

At San Antonio, Texas came on for hearing the Motion of Sentry Savings Association for Relief from Stay. After hearing, the court requested briefs from the parties. This opinion memorializes that decision, and constitutes its findings of fact and conclusions of law as well.

### FACTS

The debtor in this case is a California limited partnership whose sole asset and *raison d'etre* is an apartment complex in Lubbock, Texas. The complex was built in 1978 by Builders Property Company, with money borrowed from Sentry Savings Association ("Sentry Savings"). The builder transferred title to Builders Property Company No. 103 ("BPC"), which in turn signed onto the first lien obligation to Sentry Savings. BPC then sold the apartment complex to Frank M. Short on a wrap note and mortgage, taking back a second lien. Short in turn sold the property to Sentry Park on another wraparound note and mortgage, retaining a third lien. All of these transactions took place in 1978. Since 1978, the complex has been managed by the Frank M. Short Management Company, owned by Frank M. Short's sons.

Sentry Park continued to own the complex from 1978 to 1986. During this period, Short loaned it money to cover operating deficits and the like. In 1986, the complex's financial situation deteriorated to the point that Sentry Park and its predecessors in interest (i.e., Frank Short and BPC) approached Sentry Savings about a payment moratorium. Sentry Savings consented, on condition that Frank Short reacquire the property. Short himself was reluctant to do so, but did arrange for the Short Family Partnership, in which he has a 77.5% interest, to take title to the property on yet another wraparound obligation, taking back a fourth lien from Sentry Park. At this point, then, Frank Short's partnership owned the property, owing payments on a wrap note to Sentry Park, which in turn owed payments on a wrap to Frank Short, individually, who in turn owed payments on a wrap to BPC, which in turn owed the first lien holder, Sentry Savings.

Efforts to refinance or sell the project throughout 1987 failed to bear fruit. Meanwhile, the moratorium expired and the obligation to make interest payments recommenced. According to Short, SFP started making these payments to Sentry Park, which in turn made *its* payments to Short. Short further contends that he made *his* payments to BPC, and assumed that BPC paid Sentry Savings. In fact, however, Sentry Savings was not getting paid. One reason, perhaps, is that BPC's principal, Bill Austin, had filed a chapter 7 bankruptcy in Houston in 1987. Sentry Savings had foreclosed on Austin's 34% partnership interest in BPC after obtaining relief from stay in Austin's bankruptcy.

As the prospects for a workout dimmed, Sentry Savings hardened its position, eventually initiating its collection efforts in earnest. SFP sought an injunction in state court to forestall foreclosure, but the request was denied. Shortly thereafter, SFP reconveyed its interest in the apartment complex back to Sentry Park (the California limited partnership) in exchange for a cancellation of its debt to Sentry. A few

days later, Sentry Park filed bankruptcy, forestalling Sentry Savings' foreclosure.[1]

At the hearing, all parties agreed that the value of the property exceeded the debt owed Sentry Savings, stipulated to be, as of the date of the petition, $2,670,676.47 plus late charges and attorney's fees. The debtor argued that the value of the property also exceeded the total of the liens against the property, though the only evidence of that comes from an offer to purchase that fell through shortly before the bankruptcy. Sentry Savings asserts the value of the project to be $4.29 million. With the cancellation of the debt to Sentry Park as a result of the reconveyance by SFP just before filing, the debts against the property (including debts owed by Sentry Park to Frank Short) now total approximately $4,558,000.00.

Sentry Savings wants relief from stay for cause, citing the debtor's bad faith in the filing of the case. Sentry Park, Frank Short, and SFP[2] respond that the bankruptcy was not filed in bad faith, but rather reflects a legitimate attempt by the various entities with an interest in the property to work out the project's financial difficulties using the tools available under the Code. As a demonstration of its good faith and its ability to achieve an effective reorganization, the debtor asked the court to take judicial notice of the plan of reorganization which it had just filed. The debtor also urges the court to consider Sentry Savings' prepetition conduct, which it contends exacerbated the debtor's problems.[3]

According to the plan of reorganization, the only unsecured claim is one for $250, held by an accounting firm. All the other claims are the various wrap note obligations and the Sentry Savings debt. The plan proposes that Sentry Park (the debtor) will reconvey the property back to the Short Family Partnership (which had itself reconveyed the property to Sentry Park just before the bankruptcy). The Sentry Savings debt will be reamortized over a new 30 year period, but the existing balloon maturity date would remain the same. The interest rate would remain unchanged. A new nonrecourse note would be executed by SFP. Sentry would retain a 10% participation in SFP "which gives Debtor some chance to realize some return of capital." Debtor's Plan of Reorganization, § 5.01. Any excess funds after monthly payments to Sentry Savings would be applied "to reimburse Frank M. Short for his out of pocket expenses subsequent to default." *Id.* A reserve fund would then be funded by any further receipts, up to $100,000. BPC and Short would then share 50/50 any further funds generated, including any funds generated by a sale, if any. *Id.* at § 5.03. The unsecured claim ($250.00) would be paid in full on the effective date of the plan. Short Management Company would continue to operate the property under the current agreement. The plan is signed by a general partner of Sentry Park, reflecting a Beverly Hills address, but also bears the signatures of Mr. Quebe on behalf of the debtor and Mr. Johnston on behalf of the Short Family Partnership and Frank M. Short. *See* footnote 2, *supra.*

## DISCUSSION

■ At issue in this case is whether cause has been shown to grant Sentry Sav-

1. The Special Warranty Deed was executed February 29, 1988, the day before the scheduled foreclosure. However, the date of execution was handwritten, crossing out the month and year printed on the deed, which was December 1987, suggesting the parties had planned in advance for this contingency.

2. The debtor was represented by Karl R. Quebe, of the law firm of Sleeper, Johnston, Helm & Fontaine. Frank Short and the Short Family Partnership were represented by P.M. Johnston, also of the Sleeper, Johnston firm. Because all three entities were represented by the same law firm, the court presumes a community of inter-

est among the three. At any rate, it was not possible in the hearing to distinguish for whom counsel's arguments at any given point were being urged. All further references to positions taken by the debtor in this opinion are a shorthand rendition of "debtor, Frank M. Short and SFP."

3. These allegations took on the tone of a lender liability lawsuit. However, similar allegations were evidently raised in the state court but failed to persuade that court to issue an injunction. The allegations are no more persuasive here.

ings relief from the automatic stay. 11 U.S.C. § 362(d)(1). Cause is an intentionally broad and flexible concept, made so in order to permit the courts to respond in equity to inherently fact-sensitive situations ("the facts of each request will determine whether relief is appropriate under the circumstances"). H.Rep. No. 595, 95th Cong., 1st Sess. 344 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6300. Sentry argues that the facts here presented bring this case well within the clearly marked boundaries of a "bad faith filing," one of the recognized examples of cause for relief. *See Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir. 1986). The debtor here, as there, has only one asset, no employees, and virtually no creditors, other than the various prior owners each of which retained a lien to secure payment of its wraparound note. The filing came on the eve of foreclosure, shortly after an unsuccessful attempt to block the lender in state court. The debtor's prospects for reorganization are alleged to be slim, based on the static occupancy and similarly static cash flow, and further based on the lack of a non-insider class of impaired claims to cast an affirmative vote on the plan. Finally, the debtor here is a "one asset entity [which] has been ... revitalized on the eve of foreclosure to isolate the insolvent property and its creditors...." *Matter of Little Creek Development Co.*, 779 F.2d at 1073; *see also In re Fry Road Associates, Ltd.*, 66 B.R. 602, 606 (Bankr.W.D.Tex.1986). Therefore, argues Sentry Savings, relief for cause is mandated.[4]

The debtor responds that SFP had perfectly good business reasons for reconveying the property to Sentry Park, and points out that the two entities are totally unrelated. The foreclosure-eve conveyance simply placed all parties in the same position they had been in before Short volunteered (through his family partnership) to try to work things out to everyone's benefit. Up until that time, Sentry Park had been in continuous ownership of the property for over eight years, and had always been a one-asset partnership with no other debts, no employees, and no other reason for being than to own this apartment complex for the ultimate benefit of its limited partners. Neither Short nor the debtor in turn have any affiliation with BCP. Thus, goes the argument, this bankruptcy merely affords everyone the opportunity to work out the competing interests of an institutional lender, prior owners holding notes secured by wraparound mortgages, and the debtor (the investor left holding the bag, as it were).

■ A slavish recitation of facts reminiscent of the illustrative factors listed in *Little Creek* will not suffice to establish bad faith sufficient to warrant relief from stay. Rather, with the court in *Fry Road*, we must focus on whether there has been an abuse of the bankruptcy process. *In re Fry Road Associates, Ltd.*, 66 B.R. at 607. While the facts of this case, taken together, suggest bad faith, the moving party has failed to make a prima facie showing of abuse of process. Absent such a showing, relief from stay is not appropriate.[5]

---

**4.** Furthermore, relying on *Little Creek*, Sentry Savings urges the court to dismiss the bankruptcy as violative of the court's equity jurisdiction. Reliance on *Little Creek* for this last proposition may be misplaced (though the headnote would seem to indicate otherwise):

> The parties agree that the bankruptcy court has the power to raise the issue of good faith *sua sponte* as an inquiry into its jurisdiction, and former Bankruptcy Act precedent in this circuit confirms their position [citations omitted]. *Our disposition renders further analysis of this question unnecessary.*

*Matter of Little Creek Development Co.*, 779 F.2d 1068, 1071 n. 1 (5th Cir.1986) (emphasis added).

**5.** This is not to say that the debtor is safe from dismissal for bad faith filing. Were Sentry Sav-

ings to have moved for dismissal under Section 1112(b), a different result might well have obtained. Dismissal motions are served on all creditors and parties in interest, and are brought under a statute which permits the court to examine all of the circumstances of the filing measured against the interest of all creditors. 11 U.S.C. § 1112(b) ("[O]n request of a party in interest ... and after notice and a hearing ... the court may convert ... or dismiss a case under this chapter, *whichever is in the best interest of creditors and the estate*, for cause, including ..."); Bankr.R. 2002(a)(5) (requiring notice to all creditors of the hearing on a motion to dismiss or convert). Stay motions, on the other hand, *focus only on protection of the affected secured creditor. Other creditors are generally

■ The last three players in a series of land flips appear in bankruptcy court, unanimously opposed to the first lien holder and unanimous in their support of a plan that would preserve each player's respective interest in the property (and prevent the adverse tax consequences which could be expected to follow a foreclosure by Sentry Savings). Because each "wraps" the previous owner's investment, all share a common concern for maintaining cash flow in order to realize a return on investment. The note and wraparound mortgage which each holds represents a financing mechanism which permits each to realize a return on its investment. The identity of interest among the investors as a group is clear, as the last three of the group are represented by a single law firm.[6] Communities of interest are not, however, themselves indicative of an insider relationship sufficient to collapse the parties to the wraparound mortgages into a single entity for purposes of determining whether there has been an abuse of process.[7] In another case, for example, the unsecured creditors might be similarly allied with the debtor against the senior secured lender, yet few would maintain that that alliance renders the creditor group an insider with an *identity* of interest with the debtor (as opposed to a community of interest).

Under slightly different facts, the court might well have found abuse of process, however. The uncontroverted evidence in this case is that the property is worth far more than Sentry Savings' mortgage against it. Were Sentry Savings to have been shown to have been undersecured, then the transfer of the asset from the Short Family Partnership back to Sentry Park would have taken on an entirely different caste, as a chapter 11 filing converts nonrecourse secured debt into recourse debt for purposes of the bankruptcy. *See* 11 U.S.C. § 1111(b)(1)(A). Sentry Park has no assets other than this property, but the evidence suggests that Frank Short and his family may have considerable assets in addition to this apartment complex. The transfer from SFP to Sentry Park would have the effect of insulating SFP's assets (and perhaps the assets of SFP's partners) from any deficiency claim suffered by Sentry Savings. Such circumstances, coupled with the timing of the filing (immediately preceding foreclosure), Frank Short's status as an upstream mortgagee, and SFP's lack of success in convincing a state court judge to grant a temporary injunction, would make a much stronger case for abuse of process. Because the evidence here presented indicates that Sentry Savings will likely suffer no such deficiency, however, it makes no difference what other assets SFP might have *vis-a-vis* Sentry

not served or noticed (absent a local rule, such as Local Rule 9013(g) in this district, which requires service on the twenty largest unsecured creditors in a chapter 11 case). Were the court to use the same test in such motions as that used in dismissal actions, a secured creditor could obtain the same relief without the participation of other creditors and get a statutorily expedited hearing to boot. *See* 11 U.S.C. § 362(e). Only if the evidence indicates an abuse of process which directly harms the moving creditor should "bad faith" serve as cause for relief from stay.

6. It is difficult to overlook the ease with which the property has been transferred from Short to Sentry Park to Short Family Partnership to Sentry Park (and, under the plan, back to Short Family Partnership). The plan also acknowledges the investment nature of the wraparound obligations by reconstituting each of the underlying wrap notes as equity or profit participations.

7. This court declines to call into question the legitimacy or efficacy of wraparound mortgage

transactions in bankruptcy proceedings. *See generally* Annotation, *Validity and Effect of "Wraparound" Mortgages Whereby Purchaser Incorporates into Agreed Payments to Grantor Latter's Obligation on Initial Mortgage,* 36 A.L.R. 4th 144 (1985). The potential for recourse liability as between or among the holders of wraparound mortgages for failure to satisfy the underlying first lien heightens the economic incentive for cooperation while at the same time underlining the potential for litigation among the parties. *See Newsom v. Starkey,* 541 S.W.2d 468 (Tex.Civ.App.—Dallas 1976, no writ) (giving effect to a contractual provision in a wraparound mortgage obligating the mortgagee to make the payments to the underlying mortgage holder); *Daugharthy v. Monritt Associates,* 293 Md. 399, 444 A.2d 1030 (Ct.App.1982) (recognizing sales subject to pre-existing mortgages as distinct from sales by assumption of such mortgages, and giving effect to the nonrecourse nature of the obligation so created).

Savings. The evident motivation was to give all mortgagees subsequent to Sentry Savings an opportunity to preserve their respective "investments" in the property. *See* Annotation, *Validity and Effect of "Wraparound" Mortgages Whereby Purchaser Incorporates into Agreed Payments to Grantor Latter's Obligation on Initial Mortgage,* 36 ALR4th 144, 148 (1985). Under these facts, no abuse of process is shown.

## CONCLUSION

For the foregoing reasons, the court finds as a matter of both fact and law that Sentry Savings has failed to make out a prima facie showing of an abuse of the bankruptcy process by the debtor, Frank Short, and the Short Family Partnership, sufficient for the court to find that cause has been shown to grant relief from the automatic stay to Sentry Savings. It is therefore

ORDERED, ADJUDGED and DE-CREED that the Motion for Relief from Automatic Stay for Cause and the relief requested therein be and the same is hereby denied, without prejudice to refiling and without prejudice to Sentry Savings' seeking relief under 11 U.S.C. § 1112(b) in accordance with the procedures set out in the Bankruptcy Rules.